# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NINA MARIE COLEMAN,         )
                                    )
            Plaintiff,         )
                                    )
      v.                   )        Civil Action No. 20-0395 (BAH)
                                    )        Chief Judge Beryl A. Howell
FEDERAL EMERGENCY         )
MANAGEMENT AGENCY,         )
                                    )
            Defendant.     )

## MEMORANDUM OPINION

Plaintiff Nina Marie Coleman brings this employment discrimination action against her former employer, the Federal Emergency Management Agency ("FEMA"), a component of the United States Department of Homeland Security ("DHS"), under Title VII of the Civil Rights Act of 1964, as amended, *see* 42 U.S.C. § 2000e *et seq.*[1]  Plaintiff alleges discrimination based on race (Count I) when FEMA: (1) placed her on non-deployable status for about one month, from September 26, 2016, to October 25, 2016; and (2) terminated her employment on February 13, 2017.  *See* Am. Compl. ¶¶ 97-99, ECF No. 60.  Further, she alleges retaliation based on her September 2016 EEO activity (Count II) when FEMA: (1) declined to extend her deployment to Louisiana in September 2016; (2) placed her on non-deployable status from September 26, 2016, to October 25, 2016; and (3) terminated her employment on February 13, 2017.  *See id.* ¶¶ 104-13.  Following approximately seven months of discovery, during which time plaintiff was

---

[1]      The proper defendant to an action under Title VII is the head of the department or agency.  *See* 42 U.S.C. § 2000e-16(c); Fed. R. Civ. P. 25(d).  In view of the fact that plaintiff was proceeding *pro se* when she filed her original complaint, and named the wrong defendant, FEMA, the Court proceeds as if plaintiff had named the current DHS Secretary as the party defendant, to whom the Court refers as "FEMA" or "defendant."  For administrative convenience, the case caption remains unchanged.

represented by retained counsel, defendant now seeks summary judgment.  *See generally* Def.'s

Mot. Summ. J., ECF No. 75.  For the reasons discussed below, this motion is granted.

## I.    BACKGROUND

Set out below is pertinent factual background and procedural history in resolving the

pending motion.

Plaintiff's "career in disaster assistance" began in 2005 with a deployment following

Hurricane Katrina in the employ of a FEMA contractor.  Pl.'s Rule 7(H)(1) Statement of

Genuine Issues of Material Facts Precluding Summ. J. ("Pl.'s SMF") ¶ 1, ECF 78-1.  FEMA

hired plaintiff in 2007, *see* Pl.'s Response to Def.'s Statement of Undisputed Material Facts

("Pl.'s Resp. SMF") ¶ 2, ECF No. 78-1, or 2008, *see* Mem. of P. & A. in Support of Def.'s Mot.

for Summ. J. ("Def.'s Mem."), ECF No. 75-1, Def.'s Statement of Undisputed Material Facts

("Def.'s SMF") ¶¶ 1, 63, ECF No. 75-2.[2]  Relevant to this case are plaintiff's deployments to

Baton Rouge, Louisiana in August 2016, designated DR-4277-LA, and to Norfolk, Virginia in

September 2016, designated DR-4291-VA, discussed below.

### A.    Disaster Assistance Employees at FEMA

Plaintiff, an African American woman, was a Disaster Assistance Employee ("Reservist"

or "DAE").  *See* Def.'s SMF ¶¶ 1, 63; *see also* Def.'s Mem., Ex. 3 (FEMA Reservist Program

description), ECF No. 75-5.  A Reservist would "deploy[] to various parts of the country

following natural disasters to support FEMA's mission of providing support services to survivors

and their communities."  *Id.* ¶ 2.  This was an at-will, intermittent position, *id.* ¶ 1, from which a

Reservist could "be terminated at any time, with cause (*e.g.*, poor performance or misconduct) or

without cause (*e.g.*, downsizing of workforce, change in program direction), and could "be

---

[2]    Where a proffered fact is not disputed, and where the parties rely on the same exhibit, the moving party's submission is cited.

released from an assignment at any time and with little or no notice based on the needs of the operation," Def.'s Mem., Ex. 1 (Conditions of Employment for Disaster Assistance Employees (DAEs)) at 2, ECF No. 75-3.  In addition, a Reservist's "work schedule and temporary geographical assignment may be changed based on the mission needs of [FEMA]." *Id.* at 2.  A Reservist was expected "to conduct [herself] in a professional manner, preserve the public trust and adhere to FEMA/DHS rules and regulations," and "to travel in the most expeditious and cost effective manner." *Id.*

For each deployment, "a Reservist is assigned a temporary duty supervisor and chain of command specific to that deployment."  Def.'s SMF ¶ 3.  The Reservist Program Manager remains a Reservist's supervisor of record, even though the temporary duty supervisors handle daily instructions and assignments during that deployment.  *Id.*  Racquel Mahone was the Reservist Program Manager and at all relevant times was plaintiff's supervisor of record.  *Id.* ¶ 34.

### B.    Plaintiff's Deployment to Baton Rouge, Louisiana (DR-4277-LA)

In August 2016, plaintiff was deployed to Baton Rouge, Louisiana (DR-4277-LA) in Disaster Survivor Assistance ("DSA") Branch I.  *Id.* ¶ 4.  Karen Mann, plaintiff's second-line supervisor, served as Branch Director, *id.* ¶ 8; John Dwyer, plaintiff's first-line supervisor, served as Group Supervisor, *id.* ¶ 7; Esther Herrera served as Branch I's Task Force Leader, *id.* ¶ 6; and Phyllis Umrani served as the Joint Field Office Survivor Mobile Application Reporting Analyst ("SMARA"), *id.* ¶ 10.[3]  As lead SMARA, Umrani "was responsible for collecting reports of the branch SMARAS . . . and distilling those reports into the final [Daily Summary

---

[3]    The lead SMARA's correct surname is Umrani, not Urami.  *See* Pl.'s Resp. SMF ¶ 10.

Report ('DSR')]."  *Id.* ¶ 10.  Mann's duties included supervision of two deputy Branch Directors, as well as the lead SMARA, a resource manager, and DSA Specialist Advisor.  *Id.* ¶ 8.

### 1.    Email Communications between Plaintiff and Umrani

Like Umrani, plaintiff also served as a SMARA, and in that capacity drafted DSRs for Branch I.  *See* Def.'s SMF ¶¶ 4-5; Pl.'s Resp. SMF ¶ 4.  On August 27, 2016, Umrani contacted plaintiff by email seeking clarification of a report plaintiff had drafted.  *See* Def.'s Mem., Ex. 9 at 3, ECF No. 75-11.[4]  Plaintiff and Umrani exchanged a series of emails that day, one of which included Umrani's suggestion that inserting "a transitional phrase such as 'however'" would clarify the meaning of a sentence.  *Id.* at 2.  Plaintiff took offense at the suggestion, responding as follows:

> Please save all the . . . English teaching.  You do not need, "however" the sentence is plan [sic] and simple.

> I know when to us[e] however, Survivors IDENTIFIED damaged areas in Baton Rouge (its [sic] a stand alone sentence), next I could use a semi-colon in place of "and" to gave [sic] an action sentence "will refer to DSA Leader".

> I think your focus should be getting the report out on time and not giving English lessons.  Its [sic] really petty, the sentence could have been removed.

*Id.*  Shortly thereafter, on the same day, plaintiff sent an email to Deputy Branch Director Mary Ellen Murchison, with copies to Mann and Deputy Branch Director Tony Nguyen, indicating her continued annoyance with Umrani's suggested language change and disparaging Umrani, stating:

> Please ask Phyllis to stop sending me emails.  I gave her, her answers regarding report questions and she replies with lecturing emails.  I do not need lectures.

---

[4]    Defendant's Exhibit 9, ECF No. 75-11, is a compilation of email messages, cited by the page numbers applied by the Court's Case Management/Electronic Case Filing ("CM/ECF") system.

> I am not the only one that feels she [sic] badgering people about reports.
>
> Her incompetence to handle one task is the reason I asked to go to the field and she will not send that demonic spirit out here to me.
>
> She has to ask so many questions about the reports because she needs more field experience, however, that is not my fault.

*Id.* at 5; Def.'s SMF ¶ 12.

On September 9, 2016, Umrani sent an email message to plaintiff, who deemed the email to be "hostile and unprofessional," Pl.'s Resp. SMF ¶ 13, because the email raised a question about an item in the DSR for that day, *see* Def.'s SMF ¶ 13. Plaintiff responded by email to Umrani, with copies to Murchison, Nguyen, Herrera, Mann and Program Analyst Lavar James, stating:

> Phyllis I asked you to standby, please do not continue to badger me about this . . . .
>
> Also, you have placed several concerns on the report and did not ask for details, your trends you place up top do not have answers to the question. You are reporting survivors are saying, you guys have never instructed to provide what was said regarding Trends, Concerns, Rumors, Etc.

Def.'s Mem., Ex. 9 at 7. Nguyen responded with a request that the parties "stay professional" and suggested he meet with plaintiff and Umrani. *Id*. at 6. Plaintiff declined to meet in an email to Nguyen, with copies to Murchison, Herrera, Mann and James, stating:

> Tony, thanks for assisting with this matter. I feel JFO leadership have [sic] allowed Phyllis to go too far with harassing us in Branch I.
>
> She is asking us questions she already has answers to, or about things she could simply make changes to, omit and/or research for herself. She goes on and on about our report input and in the end our input is not even in the final report. Time wasted.

> Also, thanks for offering to have a sit down, however, I do not feel it will be beneficial to sit down with Phyllis, her spirit is not right. As well, I feel others have allowed her being new in the position as an excuse to harass us. We have a trail of her harassing emails. If the harassment continues I will exercise my right and I will be sitting down with ERO. She started harassing me because she could not harass Esther [Herrera] anymore but I will not play these games.[5]

> Hopefully, by JFO leadership finally taking notice she will stop[.]

*Id.* at 6.

The tone of these and other emails did not go unnoticed. Even before Nguyen's invitation for a meeting with plaintiff and Umrani, Mann sent plaintiff an email, on August 30, 2016, suggesting that plaintiff's "emails . . . come[] across rather critical and condemning." Def.'s Reply in Support of Def.'s Mot. for Summ. J. ("Def.'s Reply"), Ex. 20 at 2, ECF No. 87-4.

### 2.    Two-Day Training Class on Report Writing

Management scheduled a two-day training class on September 13-14, 2016. *See* Def.'s SMF ¶ 14; Pl.'s Resp. SMF ¶ 14; Pl.'s SMF ¶¶ 15-16; Def.'s Response to Pl.'s Rule 7(H)(1) Statement of Genuine Issues of Material Facts Precluding Summ. J. ("Def.'s Resp. SMF") ¶¶ 15-16, ECF No. 87-1. Defendant described the session as a SMARA class "to get the entire reports writing team for DR4277 together to collaborate and make efforts to be on the same page with the DSR process." Def.'s SMF ¶ 14. Plaintiff was included because of her "key position in this DSR reporting process." Def.'s Mem., Ex. 9 at 11. Plaintiff viewed the session as one "intended to introduce new and inexperienced SMARAs to the DSR format," and plaintiff already "was an

---

5       Plaintiff represented that Umrani and Herrera had a strained relationship dating back to an earlier deployment, *see* Pl.'s SMF ¶¶ 9, 13, and that plaintiff got "caught in the middle of [their] antipathy towards each other," *id.* ¶ 13, once plaintiff became involved with drafting DSRs.

experienced report writer," Pl.'s Resp. SMF ¶ 14, who had helped to develop the standard report

format attendees were to learn, *see* Pl.'s SMF ¶ 15; Pl.'s Resp. SMF ¶ 15.

The parties dispute whether this training class was mandatory. According to FEMA, the

"entire reports writing team for DR4277," Def.'s Mem., Ex. 9 at 11, to include all personnel

responsible for "gathering and compiling" DSRs for the Branch, were expected to attend, *see*

Pl.'s Opp'n, Ex. R (September 8, 2016, email from James to plaintiff and Dwyer, with copies to

Mann, Murchison and Nguyen) at 1, ECF No. 82. James informed plaintiff that the class "was

not . . . optional for those performing in the role" of report writer. Def.'s SMF ¶ 16. Plaintiff

questioned the characterization as "not optional," Pl.'s Resp. SMF ¶ 16, apparently because

"Herrera was not aware that the meeting was mandatory," Pl.'s SMF ¶ 23.

Plaintiff notified Dwyer she would not attend the class, Def.'s SMF ¶ 15, because,

according to Dwyer, plaintiff "fel[t] that she [would] not have anything to contribute," Def.'s

Mem., Ex. 9 at 10; Pl.'s SMF ¶ 18. Dwyer shared this information with Herrera and James by

email on September 12, 2016. Def.'s Mem., Ex. 9 at 10. Shortly thereafter, James sent plaintiff

an email advising that the class was optional for Group Supervisors, but not for personnel who

wrote reports. *See* Def.'s SMF ¶ 16. He "highly encourage[d]" plaintiff's attendance and active

participation in the class "at the request of the DSA Branch Director and Deputy Branch

Director." *Id.* Plaintiff promptly responded by email to James, with copies to Herrera and

Dwyer, that "due to personal matters [she did not] wish . . . to disclose," she would not attend the

training. Def.'s Mem., Ex. 9 at 9; Def.'s SMF ¶ 17; *see* Pl.'s Resp. SMF ¶ 17. James followed

up by email thanking plaintiff "for the heads-up," Def.'s Mem., Ex. 9 at 9; Pl.'s Opp'n, Ex. R,

and asking plaintiff "how many personal or sick leave days she would need to cover her

absence," Def.'s SMF ¶ 18.  Plaintiff clarified that she did not intend to take days off, only that "for personal reasons [she] was unable to attend the meeting."  *Id.*

Plaintiff reported for regular duty on the days the training class was held but did not attend the training as directed.  Def.'s SMF ¶ 19; *see* Pl.'s Resp. SMF ¶ 19.  According to defendant, plaintiff did not "obtain[] approval to skip the training."  Def.'s SMF ¶ 20.  Plaintiff countered that she notified defendant in advance that she would not attend, and that management acknowledged this, referring to James' "heads-up" email, *see* Pl.'s Resp. SMF ¶ 20; Def.'s Mem., Ex. 9 at 9, 24; Pl.'s Opp'n, Ex. R, which, in addition to inquiring about personal or sick leave plaintiff intended to take, expressed an intention "to make sure [management was] accommodating and supportive to [plaintiff's] needs," Def.'s Mem., Ex. 9 at 9.

### 3.    Plaintiff's Demobilization from Louisiana

In September 2016, "DR-4277-LA was rightsizing (*i.e.* downsizing)," resulting in some staff being transferred elsewhere and the deployments of other staff not extended.  Def.'s SMF ¶ 24; Pl.'s Resp. SMF ¶ 24.  Plaintiff did not request a transfer to another branch at that time. Def.'s SMF ¶ 24; Pl.'s Resp. SMF ¶ 24.

According to a list circulated on September 7, 2016, plaintiff's name did not appear among Reservists demobilizing.  Pl.'s SMF ¶ 27.  Her status was listed as "duration," which plaintiff explained meant "she would remain mobilized for the duration of the disaster."  *Id.* ¶ 28. As of September 6, 2016, however, FEMA's Deployment Tracking System ("DTS") indicated that plaintiff's demobilization date was September 17, 2016.  *See* Def.'s Reply, Ex. 18 at 4, ECF No. 87-2.

Mann sent plaintiff an email on September 13, 2016, notifying plaintiff of her upcoming demobilization scheduled for September 17, 2016.  Def.'s SMF ¶ 21; Pl.'s SMF ¶ 26.  Mann stated:

> I recognize you had concerns during your deployment, which were taken seriously.  On 09/12/201[6] Tony Nguyen and Lavar James came down to Branch I and asked your Group Supervisors and TF to address concerns from DSA leadership regarding your communication with other team members.
>
> The two day[] SMARA class was intended to get the entire reports writing team for DR4277 together to collaborate and make efforts to be on the same page with the DSR process.  Being the SMARA for Branch I, you are holding a key position in this DSR reporting process.  Your declination of participation after multiple requests plus explanation of the class being mandatory singlehandedly defeated the sole purpose of working cooperatively to identify viable solutions to issues which have arisen.
>
> With that being said, your presence at the SMARA class could have been a good opportunity for you to discuss problems you encountered; however you were non-compliant.  At this point in time, it would be best for you to evaluate your situation.  We need to work as a team and find amicable solutions to issues we encounter.

Def.'s Mem., Ex. 9 at 11.  Plaintiff maintained that she "was never informed that the class was mandatory."  Pl.'s Resp. SMF ¶ 21.

On September 15, 2016, plaintiff notified Herrera and Dwyer that she had seen a doctor who prescribed medication and instructed her to stay in bed for four days, Def.'s Mem., Ex. 9 at 67; *see* Def.'s SMF ¶ 22; Pl.'s Resp. SMF ¶ 22; Pl.'s SMF ¶ 30, extending beyond her scheduled demobilization date of September 17, 2016.  Plaintiff took four days' sick leave, through September 19, 2016, Def.'s SMF ¶ 22; *see* Def.'s Mem., Ex. 9 at 67, during which time, plaintiff represented, she was on bed rest, *see* Pl.'s Resp. SMF ¶ 22; Pl.'s SMF ¶ 30.

By email on September 16, 2016, Herrera requested a meeting with plaintiff and Dwyer at plaintiff's "earliest convenience," with the understanding that plaintiff would not be available until after September 19, 2016.  Def.'s Mem., Ex. 9 at 12; *see* Def.'s SMF ¶ 22.  Roughly 20 minutes later, plaintiff responded that she was "waiting to hear from HR regarding [her] rights under the Privacy Act and trying to handle [her] deceptive demobilization at the lowest level," proposing as a "remedy" the 60-day extension of her release date.  Def.'s Mem., Ex. 9 at 12. Plaintiff presumably was referring to Mann's September 13, 2016, email notifying her that her deployment would not be extended.

On the evening of September 16, 2016, plaintiff sent an email to Mann, Murchison, Nguyen, Mahone and several high-level FEMA officials, shifting her complaints from Umrani to Mann, stating:

> To all concerned parties: I am tired of the harassment from Karen Mann.  It saddens me that Leadership is allowing the harassment and bullying of Karen Mann and allowing her to Demob me under deception.  Her sporadic and disparate behavior is causing a hostile workplace environment.
>
> Under DSA procedures Reports and Admins do not Demob until the mission is completed in the area they are working and I have served in this position numerous of [sic] times. . . .

Def.'s SMF ¶ 23; *see* Def.'s Mem., Ex. 9 at 15.[6]

Plaintiff updated Herrera and Dwyer regarding her medical status by email on September 19, 2016, *see* Pl.'s SMF ¶ 34; Def.'s Resp. SMF ¶ 34, and provided them with doctor's notes also, *see* Def.'s SMF ¶ 25.  Mann rescheduled plaintiff's demobilization to September 22, 2016. *See* Def.'s SMF ¶ 26; Pl.'s SMF ¶ 32.  Although plaintiff had been granted additional sick leave

---

[6]     Plaintiff submits a copy of the full email, the subject line of which reads, "My Deceptive demobilization," where she asserts Mann's "reasoning for not extending [her] release date is personal," Pl.'s Opp'n, Ex. F at 1, ECF No. 79-10, and that Mann's decision was "not about a regular Demobilization procedure [but] a personal attack" on plaintiff, *id.* at 2.

through September 23, 2016, *see* Pl.'s Resp. SMF ¶ 25, she could not have claimed September 23, 2016, as a sick day because a Reservist who "is schedule[d] to demobilize and cannot travel because [she is] sick [is] not eligibl[e] for sick time for any days past [the] demobilization date," Def.'s Mem., Ex. 9 at 20; *see* Def.'s SMF ¶ 25.

The parties do not dispute that a Reservist must "check in" via DTS every morning during a deployment.  Def.'s SMF ¶ 27.  On the morning of September 22, 2016—the day plaintiff was directed to demobilize—she was expected to check in on DTS.  *See id.* ¶ 26.  Plaintiff did not check in that morning, *id.* ¶ 28, and "[b]y 2 p.m. . . . [p]laintiff had not arrived at the designated location to complete the demobilization process[,]" *id.* ¶ 30.  Plaintiff represents that she contacted her supervisors by email at 8:50 a.m. on September 22, 2016, Pl.'s Resp. SMF ¶ 30; Pl.'s SMF ¶ 35, "checking in for the day and updating them regarding her doctor's appointment the previous day," Pl.'s SMF ¶ 35; *see* Pl.'s Opp'n, Ex. JJ (September 22, 2016, email from plaintiff to Dwyer and Herrera, with copies to Murchison and Nguyen, among others) at 5, ECF No. 80-7.  Although plaintiff does not dispute that FEMA policy calls for a Reservist's daily check in on DTS, she does not explain whether or why an email to supervisors was an acceptable substitute.

If Reservists do not check in on DTS, "FEMA's policy is to schedule wellness checks with the Security Officer and/or local law enforcement officials to ensure [the Reservists'] safety."  Def.'s SMF ¶ 29.  By late afternoon on September 22, 2016, a FEMA Security Manager had called plaintiff three times and left voicemail messages because plaintiff did not answer.  *Id.* ¶ 30.  He asked a local Sheriff's deputy to visit plaintiff's hotel room for a wellness check; the deputy reported that plaintiff was not in her room.  *Id.*  Later, the Security Manager asked another Security Manager "to check in on [p]laintiff and inform her that she was to check out of

the hotel and report to the Joint Field Office on September 23, 2016." *Id.*  The second Security

Manager found plaintiff in her hotel room at approximately 7:30 p.m.  Def.'s SMF ¶ 30; *see* Pl.'s

Resp. SMF ¶ 30.

According to plaintiff, she checked in on DTS at 6:40 p.m., Pl.'s Resp. SMF ¶ 30, nearly

one hour before the Security Manager's arrival at 7:30 p.m., Def.'s SMF ¶ 30; Pl.'s Resp. SMF ¶

30.  She further represented that the Security Manager neither identified himself as affiliated

with FEMA nor inquired as to her welfare.  Pl.'s Resp. SMF ¶ 30.  This encounter, *see* Def.'s

SMF ¶ 30; Pl.'s Resp. SMF ¶ 30; Pl.'s SMF ¶ 37; Def.'s Resp. SMF ¶ 37, either was a "verbal

altercation," Def.'s SMF ¶ 30, or a "confrontation" between plaintiff and an "aggressive"

Security Manager, Pl.'s SMF ¶ 37.

On September 23, 2016, Herrera forwarded to plaintiff the following email message at

Mann's direction:

> Your scheduled demobilization date was yesterday, September 22,
> 2016, and you did not report to the JFO to complete the
> demobilization process.  Based on your email last night, you stated
> you would like to do an emergency check out so you do not have to
> drive to the JFO.  The JFO is willing to have you check out remotely,
> but in order to accomplish this you need to take the following
> actions:
>
> Request check out in DTS today, September 23, 2016 no later than
> 7:00 p.m.
>
> Return all accountable property to Esther Herrera today, September
> 23, 2016; she will stop by your hotel and pick it up from you.
>
> Meet with Esther Herrera today, September 23, 2016, to go over
> your performance appraisal[.]
>
> Also, you have indicated concerns about driving back to your
> residence of record due to the current medication(s) you are taking.
> If this is the case, the Chief of Staff is willing to provide you with a
> driver and an escort to take you home to your residence departing
> today.  If you want to take advantage of this offer please let your

> supervisor know immediately, no later than 6:00p.m. today, September 23, 2016.  If you choose to wait for a family member to pick you up and drive you home, you may do so at your own expense.  Your FEMA travel card should not be used for lodging expenses once you have demobilized, not to exceed September 23, 2016.  In addition, please remember non-FEMA employees may not drive a government rental car provided to you by FEMA.  So if a family member is picking you up, they are not authorized to drive you rental car unless they are employed by FEMA.

Def.'s Mem., Ex. 9 at 29; Def.'s SMF ¶ 31.

Herrera sent plaintiff a separate email stating that she would meet plaintiff at her hotel at 5:30 p.m. to complete the demobilization process.  Def.'s SMF ¶ 32.  Herrera was delayed, however, and called plaintiff at 4:45 p.m. to advise her of the delay, but when Herrera arrived, plaintiff declined to meet with her.  *See* Def.'s Mem., Ex. 9 at 61; Def.'s SMF ¶ 33; Pl.'s Resp. SMF ¶ 33.  Plaintiff asked to demobilize on another day, Def.'s SMF ¶ 33, and on September 24, 2016, plaintiff checked out of the hotel and returned equipment to Herrera, Pl.'s Resp. SMF ¶ 33; Pl.'s SMF ¶¶ 38-39.

### C.    Plaintiff's Placement on Non-Deployment Status on September 26, 2016, and October 25, 2016, Official Reprimand

A personnel action commenced "[a]s a result of [plaintiff's] actions during her deployment in Baton Rouge."  Def.'s SMF ¶ 34; *see* Pl.'s SMF ¶ 40.  Mahone, plaintiff's supervisor of record, "designated [p]laintiff as non-deployable in the DTS" on September 26, 2016.  Def.'s SMF ¶ 34; *see* Pl.'s SMF ¶ 41.  The parties dispute whether designating a Reservist as non-deployable when a misconduct investigation is pending is standard procedure, *see* Def.'s SMF ¶ 34; Pl.'s Resp. SMF ¶ 34, and whether the non-deployable designation arose because of a "pending personnel action," Def.'s Resp. SMF ¶ 41, or because plaintiff had filed a workers' compensation claim, Pl.'s SMF ¶ 41.

13

The investigation culminated with the issuance of an official reprimand on October 25, 2016, for inappropriate conduct and failure to follow instructions arising from (1) plaintiff's exchange of inappropriate emails on August 27, 2016, about which Mann counseled her on August 31, 2016; (2) plaintiff's email on August 27, 2016, to Murchison, Nguyen and Mann; (3) plaintiff's failure to attend the report writing training class; and (4) plaintiff's failure to demobilize in September 2016 within the requested time frame.  Def.'s SMF ¶ 35; *see* Def.'s Mem., Ex. 11 (Official Reprimand) at 2, ECF No. 75-13.  Plaintiff acknowledges the issuance of the reprimand but disputes that Mann had counseled her on August 31, 2016, about her "inappropriate and unprofessional emails."  Pl.'s Resp. SMF ¶ 35.

Plaintiff's non-deployable status did not last long.  On October 25, 2016, "Mahone removed [p]laintiff's non-deployable designation in the DTS and made her available for future deployments."  Def.'s SMF ¶ 35.  "From October 27, 2016, through November 7, 2016, [p]laintiff was deployed to Savannah, Georgia as a DSA Specialist for DR-4282-GA," *id*. ¶ 36, and on November 8, 2016, she deployed to Norfolk, Virginia as a DSA Specialist for DR-4291-VA, *id.* ¶ 37.

### D.    Plaintiff's Deployment to and Demobilization from Norfolk, Virginia (DR-4291-VA)

Mary Dawson served as Branch Director for FEMA's deployment in Norfolk, Virginia, designated DR-4291-VA.  Def.'s SMF ¶ 38.  As operations there were coming to an end, Dawson sent an email on December 13, 2016, instructing staff – including plaintiff – to make travel arrangements and to provide both a checkout date (either December 21, 22 or 23, 2016) and a travel date.  Def.'s SMF ¶ 39; *see* Pl.'s SMF ¶ 46.  Dawson admonished staff to "keep[] in mind that all travel must be completed by Friday, the 23rd."  Def.'s Mem., Ex. 9 at 37.

Ordinarily, a Reservist may "deviate from . . . authorized travel dates if [she] has prior approval from headquarters or has a valid Reasonable Accommodation [('RA')] providing for different travel arrangements." Def.'s SMF ¶ 42. According to defendant, weekend travel was not authorized for DR-4291-VA. *Id.* ¶ 46. Plaintiff advised she would check out on Thursday, December 22, 2016, and travel on Friday, December 23, 2016. Def.'s SMF ¶ 40; Pl.'s SMF ¶ 47.

Plaintiff prepared a cost comparison statement to show that travel from Norfolk, Virginia to her home in Texas by rental car, her preferred mode of transportation, cost less than travel by air. Pl.'s SMF ¶¶ 49, 51. The document indicated that plaintiff planned to travel between December 23, 2016, and December 26, 2016, *see id.* ¶ 50; Pl.'s Opp'n, Ex. OO (cost comparison statement form) at 2, ECF No. 81-8, notwithstanding Dawson's instruction that travel must end by December 23, 2016. Dawson approved plaintiff's cost comparison statement on December 22, 2016. Pl.'s SMF ¶ 52. According to FEMA, "[t]he signed cost-comparison ha[d] no bearing on the date [by which] all travel [must be] completed." Def.'s SMF ¶ 61.

In addition, plaintiff submitted a timesheet to Dawson which reflected travel on Saturday, December 24, 2016, prompting Dawson, on December 21, 2016, to ask plaintiff to review the timesheet because "it had hours for Saturday the 24th." Def.'s SMF ¶ 43. Plaintiff submitted to Dawson, on December 23, 2016, another timesheet, which Dawson again asked plaintiff to "redo . . . because she improperly claimed time for travelling on the December 24, 2016, which was a Saturday." *Id.* ¶ 45.

On December 24, 2016, plaintiff contacted Dawson by email, claiming she did not know weekend travel was not authorized, and representing she had a Reasonable Accommodation "permitt[ing] her to take longer than normal." *Id.* ¶ 47; *see* Pl.'s SMF ¶¶ 47, 55. Dawson, who

was not aware of a Reasonable Accommodation on file, instructed plaintiff, who already was on

her way home, to continue her trip.  Def.'s SMF ¶ 48; Pl.'s SMF ¶¶ 56-57.  Plaintiff completed

travel on December 25, 2016.  Def.'s SMF ¶ 50.

Dawson sent plaintiff an email on December 27, 2016, asking for an amended timesheet

taking into account the purported Reasonable Accommodation.  Def.'s SMF ¶ 51.  Further,

Dawson stated:

> While the RA does allow for certain accommodations for travel, it does
> not permit you to travel on days outside of the travel guidance I
> provided (days that would require additional OT in a 40 hour work
> week) . . . .
>
> Also, I do not understand why you chose to "work" on your checkout
> day, when I clearly stated that your last day would consist solely of
> training and checkout, and I had already sent the *final* DSR on
> Wednesday evening.  You could have been driving home on Thursday.

Def.'s Mem., Ex. 9 at 46-47 (emphasis in original); *see* Def.'s SMF ¶ 51.  Plaintiff responded:

> Mary I am tired, home and I am not going to continue to be harassed
> and bullied over my hours nor travel.  I have never needed an RA to
> travel before now and I have traveled for three years by car.  I would
> think my RA is in my file, [Herrera] also knew, because she knew I
> had back issues and when I arrived here I told her I am not left [sic]
> so many pounds, sit or walk for so long.  I I [sic] also told my Crew
> Lead and he said it was fine.
>
> I do not feel an RA # has nothing [sic] to do with traveling, we have
> the right to travel by car with or without an RA.  I will seek
> guidances [sic] from others and contact you guys back.  I feel this is
> harassment.

Def.'s SMF ¶ 52; *see* Def.'s Mem., Ex. 9 at 46.

Plaintiff represented that she submitted a Reasonable Accommodation request on October

28, 2016, Pl.'s Resp. SMF ¶ 53, but this representation was not supported by the first exhibit

cited, which exhibit consists only of email communications between plaintiff and Dawson

merely reflecting Dawson's lack of awareness of a Reasonable Accommodation.  *See* Pl.'s

16

Opp'n, Ex. M (Report of Investigation, Agency Case No. HS-FEMA-27303-2016) at 75, ECF No. 84.  The second exhibit cited, *see id.*, Ex. M (October 28, 2016, email from plaintiff to Mahone) at 545, ECF No. 83-1, shows that plaintiff *requested* a Reasonable Accommodation, but no grant of this request.  Notwithstanding plaintiff's presumption that the "RA is in [her] file," Def.'s Mem., Ex. 9 at 46, she has not cited an exhibit offering information from anyone other than herself about the nature or scope of the accommodation requested, particularly whether plaintiff called for accommodation for travel, and if approved, whether the reasonable accommodation applied to the Virginia deployment, and whether the accommodation would have permitted travel after December 23, 2016.

According to defendant, plaintiff had a temporary Reasonable Accommodation, *see* Def.'s Mem., Ex. 9 at 59, but that was limited to the Georgia deployment, *see id*. at 54.  No Reasonable Accommodation was in effect for the Virginia deployment, Def.'s SMF ¶ 53, or otherwise, and even if a Reasonable Accommodation were in place, travel still would have had to conclude by December 23, 2016, as "[t]raveling past [December 23, 2016] would be overtime and weekend travel was not authorized," Def.'s Mem., Ex. 5 (Mahone Decl.) at 25, ECF No. 75-7; Def.'s SMF ¶ 46.  Plaintiff points to two subsequent events—payment of a travel voucher for weekend travel, and payment to her for overtime—as support for her position that her travel on Saturday, December 24, 2016, was authorized.  *See* Pl.'s Resp. SMF ¶ 46.

### E.   Plaintiff's Placement on Non-Deployable Status on January 27, 2017, and Termination Effective February 13, 2017

Mahone designated plaintiff as non-deployable in the DTS on January 27, 2017, pending an investigation arising from plaintiff's "non-compliance when demobilizing from VA-4291[]." Def.'s SMF ¶ 55; *see* Pl.'s SMF ¶ 65.

On February 13, 2017, Mahone issued a Notice of Termination of Appointment with two charges, one of which FEMA withdrew, Def.'s SMF ¶¶ 56, 59; Pl.'s SMF ¶¶ 71-72, leaving the charge for failure to follow instructions when plaintiff did not complete her travel upon demobilization from Virginia by December 23, 2016, *see* Def.'s SMF ¶¶ 56, 62; Pl.'s SMF ¶ 72.[7] In relevant part, the Notice stated:

> On December 13, 2016, while on deployment to DR 4291 in Virginia, you received an email from your field supervisor Mary Dawson which instructed: "You may checkout on the 21st, 22nd or 23rd; keeping in mind that all travel must be completed by Friday, the 23rd." You failed to follow these instructions by travelling on December 24, 2016 and failing to return your rental car until December 25, 2016.
>
> On Saturday, December 24, 2016 you failed to comply with agency policy when you drove from Norfolk, VA to Dallas, TX in a government rental car without official approval . . . .
>
> After you completed your travel, you informed Ms. Dawson that you have a reasonable accommodation which necessitates you travel by vehicle instead of common carrier. However, your reasonable accommodation number was not indicated on your travel voucher. Additionally, the reasonable accommodation request you filed on October 28, 2016 is no longer current and does not include any mention of a need for travel accommodations . . . .
>
> Your behavior on your last deployment during the time frame of December 23-24, 2016 will not be tolerated nor condoned.

Def.'s Mem., Ex. 13 (Notice of Termination of Appointment) at 2-3, ECF No. 75-15. Mahone took into account plaintiff's prior reprimand for misconduct in deciding to terminate plaintiff's employment. Def.'s SMF ¶ 57; *see* Def.'s Mem., Ex. 13 at 4.

Plaintiff's termination was effective February 13, 2017, and because plaintiff did not submit a timely appeal, the termination stood. *See* Def.'s SMF ¶¶ 56, 58-59; Pl.'s SMF ¶ 73.

---

[7] "On March 16, 2017, FEMA notified [p]laintiff that the charge for failure to follow written agency policy relating to the cost-comparison statement would be removed from agency records because Plaintiff actually completed a cost-comparison statement." Def.'s SMF ¶ 59; *see* Pl.'s SMF ¶ 72.

Plaintiff disputes that she failed to submit a timely appeal, explaining that she did file an appeal because the EEO counselor told her not to.  *See* Pl.'s Resp. SMF ¶ 59; Pl.'s Opp'n, Ex. D (Coleman Dep.) at 56, ECF No. 79-6.

### F.    Plaintiff's 2016 EEO Activity

Plaintiff contacted an EEO counselor at FEMA's Office of Equal Rights on September 12, 2016.  Def.'s SMF ¶ 64; Pl.'s SMF ¶ 25.  She filed a formal complaint on September 26, 2016, and amendments on November 4, 2016, February 13, 2017, and March 16, 2017.  Def.'s SMF ¶ 64.  Mahone, who is African American, Def.'s SMF ¶ 67, was aware of plaintiff's 2016 EEO activity when she terminated plaintiff's employment, and averred that this "prior EEO activity was not a factor in any of her actions regarding [p]laintiff," *id.* ¶ 74.

### G.    Procedural History

Plaintiff filed her original *pro se* complaint on December 27, 2018, in the United States District Court for the Northern District of Texas.  Shortly thereafter, on December 31, 2018, the court granted plaintiff's motion to proceed *in forma pauperis*, ECF No. 6, and directed plaintiff to complete a Magistrate Judge's Questionnaire, ECF No. 7.[8]  Plaintiff submitted her Answers to Magistrate Judge's Questionnaire, ECF No. 8, additional exhibits, ECF No. 9, and amended responses to the Magistrate Judge's Questionnaire, ECF No. 10, in January, 2019.

 After service of process, ECF Nos. 17-19, FEMA moved to dismiss or, alternatively, to transfer the case, ECF No. 21, to this Court.  With plaintiff's consent, ECF No. 36, the case was transferred to this Court, on November 25, 2019, *see* Memorandum Opinion and Order, ECF No.

---

[8]      *See Berry v. Brady*, 192 F.3d 504, 507 (5th Cir. 1999) ("To aid in the determination of whether an [*in forma pauperis*] complaint is frivolous or fails to state a claim, this Court has approved the use of an evidentiary hearing or questionnaires.  Responses to such an inquiry become part of the plaintiff's pleadings." (citations omitted)).

40, and the case directly assigned as a related case, under Local Civil Rule 40.5(a)(3), to the undersigned in February 2020.[9]

FEMA again moved to dismiss or for summary judgment, ECF No. 45, on June 19, 2020. In response, plaintiff, now represented by counsel, opposed the motion and moved to amend the complaint, ECF No. 49, to add a claim under the under the Rehabilitation Act, *see* 29 U.S.C. § 701 *et seq.*, alleging that she was terminated because of her disabilities and requests for accommodation, and that FEMA failed to accommodate her disabilities.  She had not exhausted a disability claim, however, and on November 6, 2020, plaintiff was denied leave to add the Rehabilitation Act claim while at the same time, defendant's then-pending dispositive motion was denied, without prejudice, and to address the verbose and disorganized nature of plaintiff's *pro se* complaint, plaintiff was directed to file an amended complaint setting forth more clearly her Title VII claims.  Order, ECF No. 59.  Plaintiff filed her amended complaint, ECF No. 60, on November 25, 2020, and defendant filed its answer, ECF No. 67, on May 17, 2021.

Meanwhile, on December 23, 2020, defendant again moved to dismiss or for summary judgment, ECF No. 61, to which plaintiff responded seeking leave, pursuant to Federal Rule of Civil Procedure 56(d), to conduct discovery, ECF No. 62.  On April 26, 2021, defendant's dispositive motion was denied, without prejudice, and plaintiff's request to conduct discovery was granted.  Order, ECF No. 64.  The parties' subsequent proposed schedule for discovery was

---

[9]      Plaintiff is no stranger to this Court.  This matter is the third of four cases transferred here from the Northern District of Texas.  The first case, No. 18-cv-2268, addressed race discrimination and retaliation claims occurring after FEMA terminated plaintiff's employment on February 13, 2017, and summary judgment was granted to defendant.  *See Coleman v. Mayorkas*, No. 18-CV-2268, 2021 WL 930263, at *1 (D.D.C. Mar. 11, 2021).  The second case, No. 19-cv-3496, recently reassigned to Magistrate Judge Upadhyaya for all purposes, raises race discrimination and retaliation claims in connection with plaintiff's deployment to Forrest Hills, New York in 2013.  Defendants' summary judgment motion, filed on July 11, 2022, has not yet been briefed fully.  The fourth case, No. 22-cv-0051, raises race discrimination, age discrimination, and retaliation claims pertaining to plaintiff's non-selection for an Emergency Management Specialist position in 2021, remains pending.

adopted, Minute Order (May 10, 2021), and, following the close of discovery and the grant of requested extensions, *see* Minute Orders (Feb. 18, 2022, Mar. 14, 2022, and Mar. 18, 2022), defendant's pending motion for summary judgment is now ripe for resolution.

## II.   LEGAL STANDARDS

### A.   Summary Judgment Under Rule 56

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "A genuine issue of material fact exists 'if the evidence, viewed in a light most favorable to the nonmoving party, could support a reasonable jury's verdict for the nonmoving party.'" *Figueroa v. Pompeo*, 923 F.3d 1078, 1085 (D.C. Cir. 2019) (internal quotation marks omitted) (quoting *Hairston v. Vance-Cooks*, 773 F.3d 266, 271 (D.C. Cir. 2014)).  The moving party bears the burden to demonstrate the "absence of a genuine issue of material fact" in dispute, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), while the nonmoving party must present specific facts, supported by materials in the record, that would be admissible at trial and that could enable a reasonable jury to find in its favor, *see Anderson v. Liberty Lobby, Inc.* ("*Liberty Lobby*"), 477 U.S. 242, 248 (1986); *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015) (noting that, on summary judgment, the appropriate inquiry is "whether, on the evidence so viewed, 'a reasonable jury could return a verdict for the nonmoving party'") (quoting *Liberty Lobby*, 477 U.S. at 248).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury is as much art as science."  *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011).  This evaluation is guided by the related principles that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 572

U.S. 650, 656 (2014) (per curiam), and "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *id.* at 651 (internal quotation marks omitted) (alteration in original) (quoting *Liberty Lobby*, 477 U.S. at 255). Courts "may not make credibility determinations or weigh the evidence," *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 565 (D.C. Cir. 2019) (internal quotation marks and citations omitted), since "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (internal quotation marks and citation omitted); *see also Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 296 (D.C. Cir. 2015).

## B.   *McDonnell Douglas* Framework

If a plaintiff presents no direct evidence of discrimination, such as "a statement that itself shows [unlawful] bias in the [employment] decision," *Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011), she may prove discrimination through circumstantial evidence using the familiar three-part burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973) (Title VII). Generally, a plaintiff establishes a *prima facie* case of discrimination by showing that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2007). The burden-shifting framework set forth in *McDonnell Douglas* also applies to a retaliation claim. *See Walker v. Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015). A prima facie case of retaliation requires a showing (1) that plaintiff engaged in statutorily protected activity; (2) that she suffered a

materially adverse action at the hands of her employer; and (3) that a causal link connects the two.  *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010).

"Where there has been an adverse employment action and the employer asserts a legitimate, non-discriminatory . . . reason for the decision, we focus on pretext."  *Oviedo v. Wash. Metro. Area Transit Auth.*, 948 F.3d 386, 395 (D.C. Cir. 2020) (citing *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008)).  Thus, where an employer asserts a legitimate, nondiscriminatory reason for an adverse employment action, the "central inquiry" for a court evaluating a defendant's motion for summary judgment becomes "whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis."  *Id.* (citation omitted); *see also DeJesus v. WP Co. LLC*, 841 F.3d 527, 532-33 (D.C. Cir. 2016).

## III.   DISCUSSION

The parties do not dispute that plaintiff experienced adverse employment actions.  FEMA "assume[s] for purposes of this motion only that [p]laintiff can prove a prima facie case of discrimination or retaliation," Def.'s Mem. at 16, concedes that termination is an adverse action, *see id.* at 13, and in light of *Chambers v. District of Columbia*, 35 F. 4th 870 (D.C. Cir. June 3, 2022) (en banc), withdraws arguments that its "decisions not to extend [p]laintiff's Louisiana deployment in September 2016 and to later place her in non-deployable status in September 2016 are not adverse actions," Def.'s Not. of Withdrawal at 2, ECF No. 88.  Thus, the discussion that follows addresses FEMA's legitimate non-discriminatory and non-retaliatory reasons for its decisions to end the Louisiana deployment in September 2016, to place plaintiff on non-deployable status, and to terminate plaintiff's employment, after which the Court addresses

23

plaintiff's proffer of comparators for the purpose of demonstrating that FEMA's proffered reasons are pretextual.

### A.      Declining to Extend Plaintiff's Louisiana Deployment in September 2016

Plaintiff, who claims not have known of her demobilization date of September 17, 2016, prior to Mann's September 13, 2016, email, asserts FEMA "change[d] in position" one day after she initiated contact with FEMA's Office of Civil Rights.  Pl.'s Opp'n at 10.  Given the temporal proximity between Mann's email and plaintiff's contact with an EEO counselor, *see id.*, the suggestion is that FEMA ordered plaintiff to demobilize in September 2016, rather than have her remain in Louisiana for the duration of the disaster-related deployment, in retaliation for having engaged in protected activity, *see id.* at 8, 10.  In addition, insofar as the decision not to extend her Louisiana deployment is connected to plaintiff's refusal to attend the report writing training class, plaintiff disputes that class attendance was mandatory, *see id.* at 11, suggesting that refusal to attend should not be counted against her, particularly because she had informed her supervisors in advance that she would not attend, *see id.*, albeit for personal reasons she has not disclosed.

FEMA initially argued, prior to the D.C. Circuit's decision in *Chambers,* that the decision not to extend plaintiff's Louisiana deployment is not an adverse action, *see* Def.'s Mem. at 13-14, without addressing any legitimate nonretaliatory reasons for this decision.  Ample evidence in the record, however, supplies such legitimate nonretaliatory reasons for this decision.

First, the record demonstrates that the entire deployment was to end in or about September 2016 anyway.  *See, e.g.,* Pl.'s Mem., Ex. E at 2-6, ECF No. 79-8; *see generally* Reply, Ex. 18 at 2-5, ECF No. 87-2; *see also* Def.'s SMF ¶ 24.  Although some staff members

transferred to other branches, plaintiff does not dispute that she did not contact Mann to explore transfer options at that time.  *See* Def.'s SMF ¶ 24; Pl.'s Resp. SMF ¶ 24.

Second, FEMA proffers, and plaintiff fails to rebut, that a Reservist is an "at-will [and] intermittent" employee, Def.'s SMF ¶ 1, whose "work schedule[s] and temporary geographical assignment[s] may be changed based on [FEMA's] needs," and who "may be released from an assignment at any time and with little or no notice based on the needs of the operation," Def.'s Mem., Ex. 1 at 2, ECF No.75-2, even if she is "in a non-pay status" from time to time "during the period of [her] appointment," Pl.'s Resp. SMF ¶ 1.  Plaintiff does not establish that FEMA was obligated to notify her in advance of a demobilization.  If anything, Mann's September 13, 2016, email FEMA provided notice that the Conditions of Employment for DAEs do not require.

Third, notwithstanding the timing of Mann's September 13, 2016, email, plaintiff does not demonstrate that Mann was aware of plaintiff's EEO contact the previous day.  Rather, FEMA demonstrates that Mann did not learn of plaintiff's EEO contact until September 15, 2016, *after* she notified plaintiff by email that her deployment would not be extended.  *See* Def.'s Mem., Ex. 4 (Mann Decl.) at 3, ECF No. 75-6.

Fourth, whether or when plaintiff's name appeared on any list with a set demobilization date, FEMA demonstrates that, according to DTS, as of September 6, 2016, plaintiff was scheduled to demobilize on September 17, 2016.  She did not demobilize on that date only because she requested, and supervisors granted, sick leave through September 23, 2016.

To the extent plaintiff's refusal to attend the report writing training class was a factor in FEMA's decision not to extend plaintiff's deployment, plaintiff's argument is unavailing.  To show that the class was optional, she relies on Herrera's lack of awareness "of there being any sort of mandatory meeting requiring [plaintiff's] attendance."  Pl.'s Opp'n at 11.  In support,

plaintiff points to page 555 of her Exhibit M, *see* Pl.'s Resp. SMF ¶ 20, which the Court presumes is a reference to BATES 000555, reflecting the October 17, 2016, email from Herrera to plaintiff, stating in part, "I [Herrera] did not receive emails . . . on any mandatory meeting requiring Nina Coleman to attend," Pl.'s Opp'n, Ex. M at 108, ECF No. 83-1.  Plaintiff does not explain how Herrera's non-receipt of an email renders the training class optional for plaintiff.

In contrast, FEMA paints the following picture: plaintiff wrote reports; the training was designed for and not optional for all personnel who wrote reports; plaintiff was advised of the training dates and times; plaintiff was advised directly, on September 8, 2016, by Program Analyst James that the training was not optional and James strongly encouraged her to attend the training and to participate actively at the request of the DSA Branch Director and Deputy Branch Director; and plaintiff failed to attend the training class yet still reported to work on those days. Taken together, these are legitimate nondiscriminatory and nonretaliatory reasons for FEMA's decision not to extend plaintiff's deployment to Louisiana in September 2016.

### B.    Placing Plaintiff on Non-Deployable Status

Twice FEMA placed plaintiff on non-deployable status in DTS: on September 26, 2016, when an investigation arising from events during deployment in Louisiana took place, *see* Def.'s SMF ¶ 34, and on January 27, 2017, when an investigation arising from the Virginia demobilization took place, *see id.* ¶ 55.  According to FEMA, "it is standard procedure for a Reservist to be designated as non-deployable when there is a pending misconduct investigation." *Id.* ¶ 34.  Plaintiff responds with reference to page 544 of her Exhibit B, *see* Pl.'s Resp. SMF ¶ 34, presumably citing the following provision of the Disaster Operations Legal Reference:

> Normally, employees continue to work their regular duties during the time an investigation or facts are being gathered.  However, there are times where allegations or work problems are so serious that the employee's continued performance of regular duties or presence at

> work could be disruptive to the organization and work of other
> employees.  In these situations, the following options are available:
> Assign other work to the employee, or *place the employee in a non-
> duty, non-pay status while the investigation/fact-finding is being
> conducted and until other administrative decisions are made*.

Pl.'s Opp'n, Ex. B (FEMA's Disaster Operations Legal Reference) at 133 (emphasis added),

ECF No. 86-1.  The effective date of the cited manual is January 20, 2017, *see id.*, Ex. B at 1,

ECF No. 85, and thus, as FEMA observes, this provision "was not actually applicable . . . during

her deployment to Louisiana in 2016," Def.'s Reply at 7.  Even if applicable, the very language

on which plaintiff relies authorized FEMA's decision to designate plaintiff non-deployable

pending the investigations of misconduct, and plaintiff presents no evidence to suggest that

FEMA's proffered reason is pretext for race discrimination or retaliation for protected activity.

### C.    Terminating Plaintiff's Employment

FEMA terminated plaintiff for failure to follow instructions, specifically, by ignoring

Dawson's instruction to complete all travel upon demobilization from DR-4291-VA by Friday,

December 23, 2016, instead travelling on Saturday, December 24, 2016, without authorization.

Plaintiff counters that she "informed Dawson . . . she did not expect to complete travel by

December 23, 2016."  Pl.'s Opp'n at 12.  By "informed," plaintiff meant she told Dawson and

Herrera at check out on December 22, 2016, that her "trip would be a 21-hour drive without

traffic."  Pl.'s Resp. SMF ¶ 41.  The exhibits to which plaintiff refers are her own statements

prepared in connection with this and another EEO matter, *see* Pl.'s Ex. M at 324, ECF No. 83;

*id.*, Ex. N (Report of Investigation, Agency Case No. HS-FEMA-02350-2017) at 160, ECF No.

81-5, and fall short of demonstrating what information Dawson actually received.  That Dawson

may have known plaintiff had a long drive home is not actual notification "that [p]laintiff would

not be able to complete her travel by December 23, 2016[,] as instructed."  Def.'s SMF ¶ 41.

Nor could plaintiff's statement to Dawson reasonably be construed as a request for authorization to travel after December 23, 2016.

Next, plaintiff points to the cost comparison statement approved by Dawson indicating that plaintiff's travel dates were from December 23, 2016 through December 26, 2016. *See* Pl.'s Opp'n at 12.[10]  Plaintiff argues that Dawson's approval of the cost comparison authorized travel ending December 26, 2016, *see id.*; Pl.'s Resp. SMF ¶¶ 41, 62, but FEMA demonstrates, and plaintiff fails to rebut, that the cost comparison statement pertains to the cost-effectiveness of one mode of travel over another, not dates of travel, *see* Def.'s SMF ¶ 61.  Plaintiff, having received instructions to complete travel by December 23, 2016, and having been questioned by Dawson *twice* about her timesheets for pay on December 24, 2016, nevertheless planned to and actually did travel on December 24, 2016, contrary to those instructions.  Even plaintiff acknowledges she could have complied with the travel deadline by checking out earlier, for example on December 19, 2016, as she purportedly asked Herrera, *see* Pl.'s Resp. SMF ¶ 61; Pl.'s Opp'n, Ex. Y (March 8, 2017, email from plaintiff to Dawson and Herrera, among others) at 3, ECF No. 82-14, or on December 21, 2016, another alternative date Dawson proposed that would have left plaintiff two travel days.  Further, plaintiff avails herself of subsequent acts, namely payment of her travel voucher and for overtime, to argue that travel on December 24, 2016, was authorized. Reimbursement of submitted vouchers does not establish that her travel complied with her supervisor's orders, however. By the time the voucher and overtime were paid, plaintiff already had defied the rules.

---

[10]      Dawson apparently approved the cost comparison without reviewing it "carefully enough prior to signing, as [she] thought [she] was simply approving it was cheaper to rent a car one way rather than fly" from Virginia to Texas.  Pl.'s Opp'n, Ex. PP (March 13, 2017, email from Dawson to Mahone) at 1, ECF No. 81-10.

Plaintiff next argues that she had a current Reasonable Accommodation in place, *see* Pl.'s Opp'n at 12, and purportedly points to "evidence in both the record and [d]efendant's own polic[y] that a new form was not required when a reasonable accommodation is needed on a repeat basis," *id.* The policy provision on which plaintiff relies states:

> The "Request for Reasonable Accommodations" form is not required to be filled out when an individual needs a reasonable accommodation on a repeated basis (e.g., the assistance of sign language interpreters or readers). The written form is required only for the first request *although appropriate notice by the employee must be given each time the accommodation is needed*.

Pl.'s Opp'n, Ex. X (Manual, Reasonable Accommodation for the Federal Emergency Management Agency) at 87 (emphasis added), ECF No. 85-12.

FEMA demonstrates, and plaintiff did not rebut, that plaintiff had a temporary Reasonable Accommodation limited to the Georgia deployment. Plaintiff presents no evidence from which to conclude that a reasonable accommodation had been granted for and applied to the Virginia deployment, or that the accommodation, if granted, would have authorized travel after December 23, 2016.[11] Even if plaintiff had demonstrated a need for a reasonable accommodation on a repeat basis so as to avoid the submission of new request forms, plaintiff fails to demonstrate that, pursuant to FEMA policy, she provided her supervisors appropriate notice of her need for accommodation for the Virginia deployment. Consequently, for example, Dawson was unaware of an accommodation until plaintiff told her about it by email on December 24, 2016, after plaintiff's demobilization and while plaintiff was on her way home to Texas.

---

[11]     Buried in plaintiff's exhibits is an attachment to an email, dated February 13, 2017, from plaintiff to an EEO Counselor, that appears to be an accommodation request dated October 28, 2016, Pl.'s Opp'n, Ex. M (Report of Investigation, Agency Case No. HS-FEMA-27303-2016) at 75-76, ECF No. 83, and a doctor note, *id.*, Ex. M at 77, ECF No. 83. This request contains no indicia that it had been approved.

###### D.      Comparators

In an effort to show that FEMA's reasons are pretext, plaintiff points to two other FEMA employees as comparators, *see* Pl.'s Opp'n at 14, but neither proves the point she seeks to establish.

"A plaintiff may support an inference that the employer's stated reasons were pretextual, and the real reasons were prohibited discrimination or retaliation, by citing the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, . . . or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff[.]" *Walker*, 798 F.3d, at 1092 (citing *Brady*, 520 F.3d at 495 & n.3); *see also Burley*, 801 F.3d at  324.  "To prove that [she] is similarly situated to another employee, a plaintiff must demonstrate that [she] and the allegedly similarly situated . . . employee[s] were charged with offenses of comparable seriousness." *Walker*, 798 F.3d at 1092 (quoting *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999)) (citation and internal quotation marks omitted).  She "must also demonstrate that all of the relevant aspects of [her] employment situation were nearly identical to those of the [other] employee[s]." *Id.* (quoting *Holbrook*, 196 F.3d at 261) (brackets in original) (internal quotation marks omitted).  Factors to consider "include the similarity of the plaintiff's and the putative comparator's jobs and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses." *Burley*, 801 F.3d at 301 (citation omitted).  "Whether two employees are similarly situated ordinarily presents a question of fact for the jury, but the [C]ourt may find that employees are not similarly situated as a matter of law if a reasonable jury would be unable to reach that conclusion." *Duru v. District of Columbia*, 303 F. Supp. 3d 63, 73 (D.D.C. 2018) (citations and internal quotation marks omitted).

### 1.    Alex McClurkin

Plaintiff proffers Alex McClurkin, whom plaintiff represents is female and Caucasian, as a comparator.  She argues that McClurkin and plaintiff were similarly situated because McClurkin, too, was deployed to Norfolk, Virginia in December 2016, reported to Dawson during that deployment, was subject to the same travel guidance as plaintiff, did not complete her travel by December 23, 2016, and was not subjected to discipline, while plaintiff was terminated. *See* Pl.'s Opp'n at 13; *see* Pl.'s Resp. SMF ¶¶ 60, 66.

Defendant demonstrates, and plaintiff does not dispute, that McClurkin was an on-Call Response/Recovery Employee from December 2016 through February 2017 in FEMA's Recovery Directorate, who was a full-time employee "work[ing] for FEMA during steady state operations" in a position where she "could be deployed to disasters as needed."  Def.'s SMF ¶ 65.  Nor does plaintiff dispute that plaintiff and McClurkin reported to different chains of command, *see id.* ¶ 66, even though both reported in the field to Dawson for purposes of the Virginia deployment.  Mahone, plaintiff's supervisor of record, neither supervised McClurkin nor had the authority "to take action against [McClurkin] for conduct reported up from temporary supervisors at the field level," *id.*; *see* Reply at 17 n.3.  Thus, McClurkin is not a proper comparator because relevant aspects of her position were not nearly identical to those of plaintiff's position as a Reservist.

### 2.    Cindy Shepard

Plaintiff's second proposed comparator, Cindy Shepard, is Caucasian and reported to Mahone.  Def.'s SMF ¶¶ 68-69.  Shepard's offense, deemed "racially insensitive, involved . . . questioning her African American colleague as to 'why black people do not swim,'" Def.'s SMF ¶ 72, and discussing other matters "that were just not appropriate, [like] Kool-Aid and

31

watermelon," Def.'s Mem., Ex. 17 (Coleman Dep.) at 6, ECF No. 75-19; *see* Def.'s SMF ¶ 72.

The parties dispute whether Shepard's "insensitive remark" violated FEMA policy.  *See* Def.'s

SMF ¶ 71; Pl.'s Resp. SMF ¶ 71.  However "rude or insensitive" or violative of policy Shepard's

remarks may have been, the consequence for Shepard  was verbal counseling by Mahone and

diversity training, Def.'s SMF ¶ 70, and she remained in FEMA's employ, *see* Pl.'s Resp. SMF ¶

73.  In comparison, the consequence for plaintiff's offense was an Official Reprimand.  *See* Pl.'s

Resp. SMF ¶ 73.

FEMA argues, and the Court concurs, that Shepard is not a proper comparator,

principally because the offenses are not of comparable seriousness.  The evidence presented

suggests that Shepard's offense, her first, was a single incident with a single co-worker.  In

contrast, plaintiff's offenses, which are not alleged to have been racially insensitive, involved

more people and occurred over a period of time.  The August 27, 2016, email to Umrani was but

one incident giving rise to the written reprimand, and throughout the record of this case are

copies of plaintiff's emails, certain of which are written in language reasonably construed as

terse and disrespectful, and certain of which were copied to high-level agency officials to whom

plaintiff did not report and who presumably would not have been involved in the daily affairs of

any particular deployment.  Further, the conduct giving rise to plaintiff's reprimand was not only

the August 27, 2016, email to Umrani, but also a subsequent email to Murchison, Nguyen and

Mann accusing Umrani of incompetence and sending her "demonic spirit" plaintiff's way.

Shepard and plaintiff share a supervisor, Mahone, who did not consider the offenses the same,

and for good reason, as they differ in scope, tone and the number of individuals affected.  In

these circumstances, it cannot be said that either McClurkin or Shepard held positions nearly

identical to plaintiff's or that they received more lenient treatment for having committed offenses

comparable to those prompting FEMA to discipline plaintiff for inappropriate conduct and – twice – for failing to follow instructions.

## IV.     CONCLUSION

Based on the ample record before the Court, FEMA has proffered reasonable, nondiscriminatory and nonretaliatory reasons for declining to extend plaintiff's deployment to Louisiana beyond September 2016, placing plaintiff on non-deployable status pending outcome of investigations of disciplinary matters, and terminating plaintiff's employment, and plaintiff fails to demonstrate that those reasons are pretextual.  Accordingly, FEMA is entitled to summary judgment in its favor. An Order is issued separately.


DATE: September 22, 2022                    /s/ *Beryl A. Howell*

                                            BERYL A. HOWELL
                                            Chief Judge